NOTICE: Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale. Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent. See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

22-P-1138

ADOPTION OF IGOR.[1]

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The mother appeals from a decree of the Juvenile Court finding her unfit to parent the child, terminating her parental rights, and dispensing with her consent to the adoption of the child.[2] See G. L. c. 119, § 26; G. L. c. 210, § 3. Represented by counsel on appeal, she argues that she was not competent to waive her right to trial counsel; she also challenges the sufficiency of certain of the judge's findings. We affirm.

Background. In March 2019 the Department of Children and Families (DCF) commenced a care and protection proceeding in the Juvenile Court on behalf of the child, who was then four years old.[3] The judge ordered an emergency mental health screening of the mother and referred her to the court clinic for an

---

[1] A pseudonym.

[2] The child's "unknown/unnamed father" was also found unfit and his rights were terminated.

[3] In 2020, DCF changed its goal to the termination of the mother's parental rights.

evaluation of her competency to respond to the proceeding and to engage in a temporary custody hearing (or waive her right to one).[4]  The same judge presided over all subsequent matters in the proceeding.  On June 7, 2021, the first day of trial, the mother's court-appointed attorney, her fifth in the case, informed the judge that the mother was meeting with her therapist "so that she could better [be] able to address the [c]ourt in kind of the way she wants to proceed on this case"; he also moved to withdraw.  The judge ordered a competency screening (screening evaluation) at the court clinic, which was conducted that same day by a second clinician.  The mother complied with the order.

Thereafter, the judge conducted a two-day hearing on the motion to withdraw and the mother's earlier request to represent herself (competency hearing).  During the hearing, the judge warned the mother of the "pitfalls" and the potential dire consequences of representing herself, including the termination

---

[4] In a report dated March 22, 2019, a clinician (first clinician) opined that the mother had a factual understanding of the roles of the attorneys, the judge, and court procedures; the mother "demonstrated a rational understanding of how a judge considers evidence and testimony at a hearing to make a determination"; and that while the mother "demonstrated a tangential thought process . . . her thought content was free of delusion or paranoid beliefs."  The first clinician opined that further evaluation was required "to clarify the nature of her impaired thought process."  Another clinician opined that hospitalization was not required.

of her parental rights and the adoption of the child; he further counseled her it would not be in her best interest to waive her experienced counsel. He also explained her numerous duties with regard to the trial process, and unsuccessfully tried to talk her out of self-representation. After two colloquies with the mother on June 8 and June 9, 2021, the judge determined that she was competent to waive her right to counsel and that she had made an informed decision to represent herself. He appointed the same attorney as standby counsel to assist her.

In his written decision issued on the following day, the judge made detailed findings of fact and explained his decision. First, the judge continued to credit the opinion of the first clinician that the mother was competent to participate in the proceedings. See Commonwealth v. Scionti, 81 Mass. App. Ct. 266, 273 (2012) (prior mental health evaluations are relevant to competency determination). Next, based on his numerous observations of and conversations with the mother, the judge found that the mother had been "actively engaged in her defense of this [p]etition," had appeared at all pretrial hearings, and understood that DCF had removed the child from her custody as a result of allegations that the child was neglected. As evidence of the mother's understanding and insight into the trial process, the judge noted the mother's research into the child's rights under the Indian Child Welfare Act, and her questioning

3

on how the judge could ignore hearsay he had struck in limine at the trial (where he would serve as the fact finder). See Commonwealth v. Corbett, 98 Mass. App. Ct. 34, 38-39 (2020) (in making competency determination judge may rely on own observations and direct knowledge of events). Next, the judge observed that none of the mother's court-appointed attorneys had suggested that she did not or could not understand the proceedings, and further that her attorney at the time of trial, who attended her screening evaluation on June 7, had not requested the mother be evaluated for competency.[5] See id. at 39 ("impressions of counsel" are relevant to judge's competency determination). The judge found that while the mother was "overly verbose and often interrupts," there was "no indication that she [was] unaware of the nature of the proceeding nor its significance," and that her responses to his questions demonstrated she understood the issues in the case. See Scionti, supra (judge is "entitled to place great weight on [his] own communications with the defendant"). The judge further explained that earlier in the case, he had successfully talked the mother out of representing herself, but at the time of trial, and despite the judge's express request that she

---

[5] On June 9, 2021, in response to a direct question from the judge, that attorney said that he was not asking for a competency evaluation of the mother.

reconsider her decision, the mother was "adamant" that she wanted to represent herself. Drawing from the Judicial Guidelines for Civil Hearings Involving Self-Represented Litigants (2006), the judge informed the mother of her duties regarding evidentiary and procedural rules, and the mother responded that she understood she would be required to follow the rules, and that termination of parental rights was a serious matter sometimes referred to as a "civil death penalty" case. To support his finding that the mother understood the severity of the matter and was aware of what she was "requesting of the court," the judge took "particular notice" of the mother's prior experience in a different care and protection proceeding in which the mother had prevailed. Based on his subsidiary findings, the judge ultimately concluded that "the mother has a rational and factual understanding of the proceeding and its potential consequences and that she has waived her right to counsel intelligently, knowingly and voluntarily."[6]

---

[6] Trial was rescheduled to begin on June 16, 2021, but the mother arrived late on that date and again on the following day. Noting that the mother had not managed to "make it to court" on the previous day until around 3:45 P.M., the judge drew an adverse inference against the mother and allowed the trial to begin on June 17. When the mother arrived during the testimony of the second witness, the judge conducted a third colloquy with her, this time under oath. After confirming the mother's understanding of the magnitude of her undertaking, the nature of the proceeding, and the potential consequences, the judge confirmed his earlier findings on her competency to waive counsel and the validity of her waiver. At that time, the

Following forty-five days of trial, the judge concluded that the mother was currently unfit and that her unfitness was "likely to continue into the indefinite future to a near certitude." He further concluded that termination of the mother's parental rights and DCF's permanency plan were in the best interests of the child. Accordingly, he approved DCF's permanency plan of adoption. This timely appeal from the decree followed.

Discussion. 1. Waiver of the right to counsel. The mother's primary argument is that the judge committed structural error by allowing her to waive her constitutional right to an attorney. We are not persuaded.

In parental termination proceedings, courts look to the criminal law for guidance in assessing whether a waiver of the right to counsel was valid. See Adoption of William, 38 Mass. App. Ct. 661, 663-664 (1995). As to a criminal defendant who seeks to waive counsel, "a judge must determine both that the waiver is knowing and voluntary and that the defendant is competent to make it." Commonwealth v. Haltiwanger, 99 Mass. App. Ct. 543, 555 (2021), citing Godinez v. Moran, 509 U.S. 389, 400-401 (1993). See Commonwealth v. L'Abbe, 421 Mass. 262, 268 (1995) (two-part inquiry required). "Because mental illness

_____

mother executed a waiver of the right to counsel, which the judge certified.

6

itself is not a unitary concept, there is no single mental competency standard for deciding both (1) whether a defendant who is represented by counsel can proceed to trial and (2) whether a defendant who goes to trial must be permitted to represent himself" (quotation, footnote, and citation omitted).[7] Haltiwanger, supra at 555-556.  "[T]he competence that is required of a defendant seeking to waive his right to counsel is the competence to waive the right, not the competence to represent himself" (citation omitted).  Id. at 555.  To conclude that a waiver of the right to counsel was "voluntary, unequivocal, knowing and intelligent" and thus valid, Adoption of William, 38 Mass. App. Ct. at 663, an appellate court "must be confident that [the mother] was adequately aware of the seriousness of the [proceedings], the magnitude of [her] undertaking, the availability of advisory counsel, and the

---

[7] "[T]here does not seem to be any significant difference between competency to stand trial and competency to waive counsel." Commonwealth v. Johnson, 80 Mass. App. Ct. 505, 516 (2011) (Kantrowitz, J., dissenting).  See L'Abbe, 421 Mass. at 268.  A defendant is competent to stand trial unless her "mental condition is such that . . . [she] lacks the capacity to understand the nature and object of the proceedings against . . . [her], to consult with counsel, and to assist in preparing . . . [her] defense" (citation omitted).  Corbett, 98 Mass. App. Ct. at 35.  "[U]ltimately competency is based on the defendant's functional abilities," Scionti, 81 Mass. App. Ct. at 273, a standard that requires "sufficient present ability to consult with [her] lawyer with a reasonable degree of rational understanding . . . [and] a rational as well as factual understanding of the proceedings against [her]." Commonwealth v. Companonio, 445 Mass. 39, 48 (2005).

7

disadvantages of self-representation" (quotation and citation omitted).  Id. at 665.  We review a judge's competency determination for abuse of discretion, Scionti, 81 Mass. App. Ct. at 273, giving "substantial deference to his findings of fact because the judge had the opportunity to view the witnesses in open court and to evaluate the defendant personally." Commonwealth v. Prater, 420 Mass. 569, 574 (1995).  A claim of a violation of the defendant's right to counsel is reviewed de novo.  See Commonwealth v. Means, 454 Mass. 81, 88 (2009).

Here, we discern no abuse of discretion in the judge's determination that the mother was competent to waive her right to counsel.  The record establishes that out of concern for the mother's competency, the judge sent her for a screening evaluation, and conducted a two-day hearing on the matter.  See Haltiwanger, 99 Mass. App. Ct. at 556.  On the second hearing date, the two clinicians who had evaluated the mother were present.  Before allowing her attorney's motion to withdraw and the mother's request to represent herself, the judge held two colloquies with the mother; after the second, the mother waived her right to counsel.  In addition to his oral findings from the bench, the judge made the written findings required by S.J.C. Rule 3:10, § 3, as appearing in 475 Mass. 1301 (2016).[8]  See

---

[8] The competency hearing was held over the Zoom platform due to COVID-19 protocols that were then in place.  In his written

8

Haltiwanger, supra at 556-557. All of this occurred before the reschedule trial date. At their first in-person meeting on June 17, 2021, eight days after the competency hearing, the judge conducted a third colloquy under oath, obtained a written waiver of counsel form from the mother, and certified her waiver of counsel. See Commonwealth v. Johnson, 80 Mass. App. Ct. 505, 511 (2011) (formal waiver colloquy should be conducted and written waiver obtained "as soon as the defendant expressed his desire to represent himself, or shortly thereafter").

The judge cannot be faulted for the mother's failure to show up on time for trial on June 16 and June 17. In any event, given the procedural history of the case, any error in the judge's allowing the trial to proceed in her absence (and without an executed written waiver in place) does not constitute structural error requiring reversal. Contrast Johnson, 80 Mass. App. Ct. at 510-511 (constitutional error occurred where first informal colloquy between defendant and judge occurred on first day of trial, formal waiver did not occur until second day of trial, and defendant had earlier been permitted to represent himself for eighteen months, including during "critical" stages of pretrial proceedings).

_____

decision permitting the mother to represent herself and allowing the attorney's motion to withdraw, the judge stated that the "[m]other shall execute the [w]aiver of [c]ounsel form."

9

On appeal, the mother argues that her waiver was not unequivocal. It is true that the mother initially equivocated about whether she wanted to represent herself, and although her attorney represented to the judge that he had filed the motion to withdraw with her knowledge, when questioned about it by the judge the mother refused to take a position on the motion. This led to the judge continuing the competency hearing until the next day in order to give the mother the opportunity to speak with her attorney about the motion. The mother also brought up many irrelevant matters and engaged in some rambling discourse with the judge. However, when focused by the judge, the mother confirmed during the second colloquy that she had sufficient time to speak with her attorney, she wanted to represent herself as was her right, and she was agreeing to the motion for her attorney to withdraw and to the standby counsel arrangement.[9] In short, the evidence amply supported the judge's finding that the mother understood the nature of the proceedings and had waived her right to counsel knowingly, intelligently, and voluntarily.[10]

---

[9] Her attorney also confirmed that the mother had told him she wanted to represent herself with his assistance as standby counsel, and that he was satisfied he had a sufficient discussion with the mother outlining what would be entailed in self-representation. The attorney had made similar statements to the judge at the June 8, 2021, hearing.

[10] As further evidence that her waiver was "equivocal," the mother points to language she added to the waiver form stating that she was a "woman under duress." The trial judge questioned the mother about those words, and informed her that if she was

Nor did the judge abuse his discretion in his handling of the report from the clinician who performed the screening evaluation. That clinician opined that the mother had some deficits in understanding the case and that the mother "would encounter difficulty if she were to represent herself." However, as the judge noted, the clinician did not opine that the mother had any major mental illness or impairment and stopped short of opining that the mother was unable to represent herself.[11] Nothing in the report compelled the judge to find the mother incompetent to waive her right to counsel. "While it may be useful for a judge to hear opinions from medical experts, the determination [of competency] is ultimately a legal, not a medical, judgment." Commonwealth v. Carson C., 489 Mass. 54, 58 (2022), quoting Commonwealth v. Jones, 479 Mass. 1, 14 (2018).

2. Adequacy of the judge's findings. The mother argues that the judge's findings (1) "do not clearly and convincingly show that [the] mother's mental health issues had any nexus with her ability to provide minimally adequate care for her [child]";

---

claiming duress, he would not accept the waiver and would appoint counsel to represent her as well as a guardian ad litem. The mother clarified that the duress referred to other matters including "any contact with the [DCF]"; she stated that she was "not under duress to waive the counsel," and that no one had forced her to waive the right.

[11] As the mother points out, she told the clinician that she would prefer to have an attorney. However, when the judge asked her about this very statement during the June 17 colloquy, she reversed course.

and (2) do not explain how those issues and her behavior impacted her parenting or posed a future risk of harm to the child.  She also argues that the judge made no findings as to how her mental health issues resulted in abuse or neglect of the child.  We disagree.

The mother's lack of treatment for mental health issues was just one of her "grievous shortcomings" upon which the judge based his finding of unfitness.[12]  Other shortcomings included her "failure to understand the impact of her mental health on [the child], her lack of stable housing, her lack of action plan compliance and/or her failure to meaningfully benefit from the services to which she engaged, her failure to present to visits, appointments, and trial on time or at all, her continued instability in terms of her lifestyle and romantic relationships, and her lack of insight into her shortcomings as a parent."  All of these factors were relevant considerations and supported the judge's finding of unfitness.  See Adoption of Mary, 414 Mass. 705, 711 (1993).  See also Adoption of Greta, 431 Mass. 577, 587-588 (2000) (affirming decree where "it was clear from the judge's careful and comprehensive findings and

---

[12] At trial, the mother denied having any mental health issues at all.  The judge found that the full extent of her issues could not be determined "due to her refusal to engage in consistent treatment, complete requested evaluations, and cooperate with [DCF]."

12

his rationale for the decree that his judgment was not based simply on . . . [the mother's] psychiatric problems . . . but rather on a constellation of factors that pointed to termination as being in the best interests of the child").

As for nexus, the judge did explain the impact of the mother's mental health issues and behavior on the child.  For example, the judge found that after the mother "made inappropriate statements about her anxieties and concerns" in front of the child, the child would "manifest anxiety, mimicking [the] mother's behavior."[13]  Among other findings of negative impact upon the child caused by the mother's "lack of insight," the judge noted that the child displayed symptoms of anxiety during visits with the mother and "became emotional" following the mother's inappropriate statement about the foster parent. As for future risk of harm to the child, the judge found that the mother's "longstanding history of meeting random men on dating websites" -- a practice that continued during the proceedings -- had "expos[ed] [the child] to unsafe

---

[13] The judge gave several specific examples of "concerning" statements and found that the mother did not understand the impact of her behavior and statements on the child.  The judge further found that the mother endorsed beliefs not based in reality such as repeatedly stating that the child was "kidnapped," and that the mother failed to shield the child from her own anxieties.  The judge, consistent with the evidence, found that the mother's statements provoked anxiety, fear, and nervousness in the child.

individuals."  The judge noted that the child had witnessed many instances of domestic violence and "most concerning," the child had been hit during one violent episode.  The judge explained how the mother's continued risky behaviors, including her failure to acknowledge the full extent of domestic violence in her romantic relationships, placed the child at risk of future abuse and neglect.

To the extent that the mother points to evidence of her positive parenting, the judge was not required to credit it or to give it any special weight.  See Care & Protection of Jamison, 467 Mass. 269, 280 (2014) (appellate courts give substantial deference to trial judge's findings based on witness credibility and weight of evidence).

The judge explained how the mother's actions and behavior demonstrated that she could not "be an adequate, consistent caregiver for [the child]."[14]  The judge concluded, based on the

---

[14] As examples, the judge noted the mother's failure to meet with DCF consistently to discuss her action plan tasks as well as the mother's failure to arrive on time or to attend her visits consistently, which the judge found "considerably impact[ed] the amount of time she was able to spend with [the child]."  The judge found that the mother's "lackadaisical attitude" in this regard "adversely impacted" the child.  The judge further found that this behavior as well as her behavior in court demonstrated her inability to be a "stable, consistent caregiver" for the child.  The judge found that the mother was unable to adhere to a consistent routine; when asked what her plan was for providing the child with structure and routine, the mother did not acknowledge the importance of routine.

mother's belief that she had no parental deficiencies, "it is unlikely that her parenting, mental health or personal issues will be addressed in the near future.  Due to these shortcomings, [the child] would be endangered if this court were to place [the child] in [m]other's custody."

Conclusion.  For the reasons discussed above, we conclude, first, that the trial judge did not err by allowing the mother to waive her constitutional right to an attorney, and second, the judge did not err in finding the mother unfit or abuse his discretion in terminating the mother's parental rights.

Decree affirmed.

By the Court (Sacks, Grant & Smyth, JJ.[15]),

Joseph F. Stanton

Clerk

Entered:  August 23, 2023.

---

[15] The panelists are listed in order of seniority.

15